**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DMITRI MEHLHORN,

                    Plaintiff,

          v.

NO LABELS,

                    Defendant.

Case: 1:24-mc-00101
Assigned To : Walton, Reggie B.
Assign. Date : 8/14/2024
Description: misc.

Underlying Litigation:
*No Labels v. Nolabels.com Inc.*,
No 23 Civ. 1384 (D. Del.)

ORAL ARGUMENT REQUESTED

## MEMORANDUM OF LAW IN SUPPORT OF DMITRI MEHLHORN'S MOTION TO QUASH NO LABELS' NON-PARTY SUBPOENA OR MOTION FOR PROTECTIVE ORDER

John C. Quinn*
Joshua A. Matz
Hyatt Mustefa*
Jackson Erpenbach*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
(212) 763-0883
jquinn@heckerfink.com
jmatz@heckerfink.com
hmustefa@heckerfink.com
jerpenbach@heckerfink.com
*pro hac vice pending*

*Attorneys for Dmitri Mehlhorn*

# TABLE OF CONTENTS

STATEMENT OF FACTS ................................................................................................ 1

    I.  No Labels' Unsuccessful Bid to Attract a Third-Party Presidential Candidate ................. 1

    II. The Delaware Action ......................................................................................... 3

    III. No Labels' Non-Party Subpoena to Mehlhorn ................................................... 4

ARGUMENT ............................................................................................................... 8

    I.  The Mehlhorn Subpoena Requires Production of Privileged Matter ....................... 8

        A.  Mehlhorn Has Well-Recognized First Amendment Interests at Stake ................. 10

        B.  The Mehlhorn Subpoena Seeks Documents that Are Not Relevant—Much Less Crucial—to the Delaware Action .......................................................... 14

        C.  No Labels Can—And Must—Seek the Requested Information Elsewhere ........... 16

    II. The Subpoena Is Unduly Burdensome ................................................................ 17

        A.  The Requested Information Is Neither Relevant nor Sought on the Basis of Relevance ........................................................................................... 20

        B.  The Requested Information Is Not Proportionate to the Needs of the Delaware Action .............................................................................................. 21

        C.  The Mehlhorn Subpoena Poses a Substantial Burden ..................................... 21

    CONCLUSION .......................................................................................................... 23

## TABLE OF AUTHORITIES

**CASES**

*Achte/Neunte Boll Kino Beteiligungs Gmbh & Co. v. Does 1-4,577*,
    736 F. Supp. 2d 212 (D.D.C. 2010) ...................................................................... 19

*\*AF Holdings, LLC v. Does 1-1058*,
    752 F.3d 990 (D.C. Cir. 2014) ................................................................... 17, 20

*AFL-CIO v. Fed. Election Comm'n*,
    333 F.3d 168 (D.C. Cir. 2003) .............................................................................. 8

*\*Black Panther Party v. Smith*,
    661 F.2d 1243 (D.C. Cir. 1981) .................................................................. 9, 10, 20

*Buckley v. Valeo*,
    424 U.S. 1 (1976) .................................................................................................. 12

*Burlington Ins. Co. v. Okie Dokie, Inc.*,
    368 F. Supp. 2d 83 (D.D.C. 2005) ........................................................................ 18

*Call of the Wild Movie, LLC v. Does 1-1,062*,
    770 F. Supp. 2d 332 (D.D.C. 2011) ...................................................................... 18

*Carey v. Hume*,
    492 F.2d 631 (D.C. Cir. 1974) .............................................................................. 21

*Diamond Servs. Mgmt. Co. v. Knobbe, Martens, Olson & Bear, LLP*,
    339 F.R.D. 334 (D.D.C. 2021) ............................................................................. 17

*Eidos Display, LLC v. Chunghwa Picture Tubes, Ltd.*,
    296 F.R.D. 3 (D.D.C. 2013) .................................................................................. 18

*FDIC v. Galan-Alvarez*,
    No. 15-MC-0752, 2015 WL 5602342 (D.D.C. Sep. 4, 2015) ................................. 8

*\*Fed. Election Comm'n v. Machinists Non-Partisan Pol. League*,
    655 F.2d 380 (D.C. Cir. 1981) ................................................................... 9, 11, 13

*Flatow v. The Islamic Republic of Iran*,
    196 F.R.D. 203 (D.D.C. 2000) ............................................................................. 19

*Gouse v. Dist. of Columbia*,
    359 F. Supp. 3d 51 (D.D.C. 2019) ........................................................................ 17

*Int'l Action Ctr. v. United States,*
  207 F.R.D. 1 (D.D.C. 2002) ..................................................................... 10, 13

*Int'l Union, United Auto. Workers v. Nat'l Right to Work Found.,*
  590 F.2d 1139 (D.C. Cir. 1978) ................................................................ 12, 21

*In re Kincaid,*
  No. 22-MC-0067, 2023 WL 5933341 (D.D.C. Aug. 9, 2023) ....................... 9, 11

*In re Micron Tech., Inc. Sec. Litig.,*
  264 F.R.D. 7 (D.D.C. 2010) ............................................................................ 22

*Millennium TGA, Inc. v. Comcast Cable Commc'ns LLC,*
  286 F.R.D. 8 (D.D.C. 2012) ............................................................................ 18

*NAACP v. Alabama,*
  357 U.S. 449 (1958) ........................................................................................ 12

*No Labels v. Nolabels.com Inc.,*
  2023 No. 23 Civ. 1384 (D. Del. Dec. 4, 2023) .................................................. 3

*Phillips & Cohen, LLP v. Thorpe,*
  300 F.R.D. 16 (D.D.C. 2013) .......................................................................... 20

*RNC v. Pelosi,*
  602 F. Supp. 3d 1 (D.D.C. 2022) .................................................................... 13

*In re Subpoenas Served on Am. Acad. of Pediatrics,*
  No. 23-MC-0004, 2023 WL 2351729 (D.D.C. Mar. 3, 2023) ................... 9, 10, 16

*U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Cos.,*
  507 F. Supp. 2d 45 (D.D.C. 2007) .................................................................. 10

*US Dominion Inc. v. My Pillow Inc.,*
  No. 21-CV-0445, 2024 WL 2880425 (D.D.C. June 7, 2024) ............................. 20

*Va. Dep't of Corr. v. Jordan,*
  921 F.3d 180 (4th Cir. 2019) .......................................................................... 18

*Watts v. S.E.C.,*
  482 F.3d 507 (D.C. Cir. 2007) ........................................................................ 22

*Wyoming v. U.S. Dep't of Agric.,*
  208 F.R.D. 449 (D.D.C. 2002) ................................................................. *passim*

## FEDERAL RULES

Fed R. Civ. P. 26 ........................................................................................ 17, 18, 19, 23

Fed R. Civ. P. 45 ........................................................................................ *passim*

## OTHER AUTHORITIES

Daniel Lippman, *No Labels: We'd consider Haley on our ticket. Haley: No thanks*, Politico (Jan. 18, 2024), https://www.politico.com/news/2024/01/18/no-labels-nikki-haley-00136369 ........................................................................................ 2

https://web.archive.org/web/20150801191623/http://nolabels.com/ ............................................. 3

https://web.archive.org/web/20210111010736/http://nolabels.com/ ............................................. 3

https://web.archive.org/web/20240302131409/https://nolabels.com/ ............................................ 3

Meg Kinnard, *Former Maryland Gov. Hogan endorses Haley, won't mount his own third-party 2024 bid*, Associated Press (Jan. 14, 2024), https://www.pbs.org/newshour/politics/former-maryland-gov-hogan-endorses-haley-wont-mount-his-own-third-party-2024-bid ........................................................................................ 2

Samuel Benson, *No, Jon Huntsman Jr. isn't running for president,* Deseret News (Nov. 14, 2023), https://www.deseret.com/2023/11/14/23951095/jon-huntsman-jr-no-labels-president/ ........................................................................................ 2

## PRELIMINARY STATEMENT

Dmitri Mehlhorn is a prominent political activist who was sharply critical of the efforts made by No Labels to run a third-party candidate in the 2024 presidential election. In return, No Labels wrote to the Department of Justice seeking to have Mehlhorn and others investigated on federal racketeering charges. And now, No Labels, in the midst of a trademark dispute, has served Mehlhorn with a sweeping non-party subpoena seeking access to political contribution records, meeting attendance lists, donor rolls, and correspondence relating to Mehlhorn's political organizing and advocacy. Mehlhorn sought to narrow the subpoena, but No Labels refused to agree, insisting in meet-and-confer discussions that it was not restricted by the scope of its trademark case.

The First Amendment to the United States Constitution forbids the misuse of federal courts to exact this sort of political retribution. As written, the non-party subpoena would trample Mehlhorn's First Amendment right to engage in political association and speech by compelling him to turn over materials at the heart of the First Amendment privilege, which have long been recognized as protected against such invasion. Those precedents and principles must hold here. No Labels' thinly veiled attempt to seek reprisal against a perceived political opponent and to extract information for its own political purposes must be halted.

## STATEMENT OF FACTS

### I.    No Labels' Unsuccessful Bid to Attract a Third-Party Presidential Candidate

No Labels is a political organization that unsuccessfully attempted to run a third-party candidate in the 2024 presidential election. By January 2024, a number of prominent politicians had publicly declined to run under the No Labels banner, and No Labels' options for a viable third-

party candidate were dwindling.[1]  With the writing on the wall, No Labels started pointing fingers,

blaming its unsuccessful efforts on a "conspiratorial, partisan, and often unlawful conspiracy" in

a letter addressed to the Department of Justice.  Letter from B. Chavis et al. to K. Clarke et al.,

*Unlawful Harassment and Extortion of No Labels and its Supporters, Staff, Vendors, and Potential

Candidates* at 1 (Jan. 11, 2024) (Ex. A) ("DOJ Letter").  Specifically, No Labels claimed that

individuals and organizations opposed to former President Trump's campaign for President—such

as Public Citizen and the Lincoln Project—had set out to impede No Labels' third-party efforts,

and that somehow that expressive political activity violated various civil and criminal statutes.[2]

In the DOJ Letter, No Labels called out Mehlhorn by name, and tried to make hay out of

the uncontroversial fact that he attended a meeting where he and others talked about "prevent[ing]

the formation and success of a No Labels" campaign, and then some of them expressed their views

publicly.  *Id.* at 2; *id.* at 3 (citing a tweet by a nonprofit executive accusing No Labels of supporting

"MAGA HATE" and "helping Trump"); *id.* at 4 (citing an organizing meeting "to strategize over

how to stop No Labels").  On this basis, No Labels demanded that the Department of Justice

investigate Mehlhorn and others on federal racketeering charges—a ridiculous invitation that,

unsurprisingly, the DOJ has not taken up.

---

[1] *See, e.g.,* Samuel Benson, *No, Jon Huntsman Jr. isn't running for president*, Deseret News (Nov. 14, 2023), https://www.deseret.com/2023/11/14/23951095/jon-huntsman-jr-no-labels-president/; Meg Kinnard, *Former Maryland Gov. Hogan endorses Haley, won't mount his own third-party 2024 bid*, Associated Press (Jan. 14, 2024), https://www.pbs.org/newshour/politics/former-maryland-gov-hogan-endorses-haley-wont-mount-his-own-third-party-2024-bid; Daniel Lippman, *No Labels: We'd consider Haley on our ticket. Haley: No thanks,* Politico (Jan. 18, 2024), https://www.politico.com/news/2024/01/18/no-labels-nikki-haley-00136369.

[2] No Labels alleged violations of a host of federal criminal provisions, including, among others, the federal extortion statute, the Ku Klux Klan Act, and the Racketeer Influenced and Corrupt Organizations Act.  *See* DOJ Letter at 2, 6-7.

## II.    The Delaware Action

On December 4, 2023, No Labels also filed a federal trademark suit in Delaware (the "Delaware Action"), in connection with a parody website that was live for about three months at the web address www.nolabels.com (the "Domain"). In the Delaware Action, No Labels asserts claims for trademark infringement and cybersquatting against the website and its owners and operators. Complaint, *No Labels v. Nolabels.com Inc.*, No. 23 Civ. 1384 (D. Del. Dec. 4, 2023) Dkt. No. 1 ¶¶ 38-68 (Ex. B) (the "Compl." or "Complaint").

The Domain had previously been owned by No Labels, but the organization allowed its registration to lapse some time between 2015 and 2021.[3] According to the Complaint, in late 2023, Defendant NoLabels.com Inc. purchased the Domain to launch a website that mimicked the look, layout, and rhetoric of the official No Labels website but, unlike No Labels' official website, also featured photos of prominent Republican politicians, including former President Trump, speaking at a convention hosted by No Labels in 2015. *See* Compl. ¶¶ 19, 22, 26. The Complaint accuses Defendant of intending "to tarnish No Labels' centrist and non-partisan reputation by falsely associating No Labels with … candidates and positions" that participated in No Labels' conventions, but that No Labels did not officially endorse. *Id.* ¶ 30. The allegedly infringing website at www.nolabels.com went live in November 2023 and was taken down by February 2024.[4]

---

[3] *Compare* https://web.archive.org/web/20150801191623/http://nolabels.com/ (Aug. 15, 2015) (redirecting to NoLabels.org), *with* https://web.archive.org/web/20210111010736/http://nolabels.com/ (Jan. 11, 2021) (reflecting the release of the domain).

[4] *See* https://web.archive.org/web/20240302131409/https://nolabels.com/ (Feb. 25, 2024) (reflecting "403 Forbidden" error).

The filing of the Delaware Action came just a few weeks before the DOJ Letter, and a few days after sending that, No Labels made an early motion to compel discovery in the Delaware Action. Specifically, No Labels sought to identify "those who are funding Defendant and/or otherwise directing or supporting its infringing activity." Special Master Order #3, Delaware Action (Jan. 26, 2024) (Ex. C), Dkt. 60-1 at 4 (the "Special Master Order") at 4. Only after the Defendant in the case brought First Amendment objections to the Special Master did No Labels narrow its discovery demands, telling the Special Master that it was only seeking information concerning individuals or entities "who are either involved in the infringing conduct or who are undeniably relevant and important witnesses." Special Master Order, Dkt. No. 60 at 5. The Special Master permitted that more targeted discovery, and in doing so "explicitly" held that Defendant did not need to produce "donor, volunteer, or member" information to No Labels. *Id.* at 9. Elsewhere in that same order, the Special Master limited No Labels' ability to obtain discovery on Defendant's finances and financial transactions. *See id.* at 10 ("I find that Plaintiff's request for discovery into Defendant's finances, except as permitted with respect to the acquisition of the allegedly infringing domain and the Google ad campaign discussed below, should be denied."). No Labels, undeterred, tried a new tack.

### III.    No Labels' Non-Party Subpoena to Mehlhorn

Blocked by the Special Master from obtaining protected information from the Defendant in the Delaware Action, No Labels now seeks to obtain much of the same information from non-parties it suspects are political allies and supporters of the Defendant. On June 7, 2024, No Labels noticed a non-party subpoena directed to Mehlhorn (the "Mehlhorn Subpoena"), who is a political advocate and was a co-founder of Investing in Us ("IIU"). *See* Mehlhorn Subpoena (Ex. D). IIU is an un-incorporated association of individuals that promotes democracy and the rule of law

through donor-supported targeted investments in political advocacy organizations, voter outreach groups, and electoral strategy groups, among other organizations. In an effort to promote Democratic causes and thwart the re-election of former President Trump, IIU also actively opposed No Labels' efforts to launch a third-party campaign.

The Mehlhorn Subpoena seeks a broad swath of information concerning Mehlhorn's and IIU's efforts to associate and advocate against No Labels' political efforts.[5] In particular the Mehlhorn Subpoena demands:

1. All documents and communications, including electronic communications (*e.g.*, emails, texts, instant messages, and messaging applications, such as Signal or WhatsApp, etc.), concerning or with NoLabels.com Inc., including but not limited to its formation, and/or nolabels.com and/or concerning acquisition of the NoLabels.com Domain and/or launching a website at the NoLabels.com Domain.

2. All documents and communications, including electronic communications (*e.g.*, emails, texts, instant messages, and messaging applications, such as Signal or WhatsApp, etc.), concerning Plaintiff No Labels and/or nolabels.org.

3. All documents and communications, including electronic communications (*e.g.*, emails, texts, instant messages, and messaging applications, such as Signal or WhatsApp, etc.), concerning or with Break Something Inc., Stephen Solomon, Lucy Caldwell, RT Group, Charles Siler, Joshua Silver, and/or the American Patriot Project and relating to No Labels, NoLabels.com Inc., NoLabels.com, NoLabels.com Domain, and/or nolabels.org.

4. All documents and communications, including electronic communications (*e.g.*, emails, texts, instant messages, and messaging applications, such as Signal or WhatsApp, etc.), concerning the payment of money, expenditures, salaries, consulting fees, retainers, bonuses, or any form of remuneration related to No Labels, NoLabels.com Inc., NoLabels.com, NoLabels.com Domain, and/or nolabels.org.

5. All non-privileged communications concerning the Action.

---

[5] Contemporaneous with the non-party subpoena served upon Mehlhorn, Plaintiff No Labels served a near-identical non-party subpoena on IIU managing partner, Rae Steward. Steward is moving to quash the subpoena directed to her in the U.S. District Court for the Northern District of California, as required by FRCP 45(d)(3)(A), which vests jurisdiction over such motions in "the court for the district where compliance is required."

5

6. All documents and communications, including electronic communications (*e.g.*, emails, texts, instant messages, and messaging applications, such as Signal or WhatsApp, etc.), related to any in-person or virtual meetings concerning No Labels, No Labels.com Inc., No Labels.com, NoLabels.com Domain, and/or nolabels.org, including, but not limited to, attendance lists; invitation lists; presentations; slide decks; power points; schedules; correspondence; transcriptions; and recordings of these meetings.

7. All Google Docs, Google Sheets, and/or Google Slides, in native format, concerning No Labels, NoLabels.com Inc., NoLabels.com, NoLabels.com Domain, and/or nolabels.org.

Mehlhorn Subpoena at 9. The Mehlhorn Subpoena also seeks to require Mehlhorn to sit for a deposition. *Id.* at 2.

On July 12, 2024, Mehlhorn served written objections to the Mehlhorn Subpoena, including on the ground that the overly broad requests would violate his First Amendment rights. *See* July 12, 2024 Responses and Objections to the Mehlhorn Subpoena (Ex. E). Mehlhorn also objected on the ground, among others, that compliance with the Mehlhorn Subpoena would be unduly burdensome, in part because it would require electronic searches, review, and production of correspondence that, if relevant at all, could far more easily be obtained from the parties themselves. *See* Declaration of Non-Party Dmitri Mehlhorn (Ex. F) ("Mehlhorn Decl.") ¶¶ 31-35. Mehlhorn also attempted to engage in good faith negotiations with No Labels in order to minimize the undue burden of the Mehlhorn Subpoena and maintain his right to engage in political activity without the threat of politically motivated harassment, while also complying with any legitimate discovery requests.

In the meet-and-confer discussions that followed, Mehlhorn explained that the document requests are so broad as to cover virtually all of his expressive and associational political activity related to No Labels and, as a result, the requests are both inconsistent with his First Amendment rights and far outside the scope of the relatively narrow trademark and cybersquatting allegations

at issue in the Delaware Action. In response, No Labels acknowledged that the Mehlhorn Subpoena was not limited to No Labels' claims and defenses in the Delaware Action but insisted that it was not bound by the scope of what is at issue there. *See* Declaration of John C. Quinn ¶ 4. In an effort to find a reasonable compromise, Mehlhorn offered to conduct targeted searches across relevant search platforms for documents or communications using search terms tied to the Domain and/or the allegedly infringing conduct, and to produce any responsive communications identified through those searches.

No Labels refused to agree and insisted instead on collecting all of Mehlhorn's and IIU's political activity relating to No Labels without any link to the allegedly infringing activity underlying No Labels' Complaint. *See* July 19 – Aug. 2, 2024 Meet & Confer Email Exchange (Ex. G) ("M&C Exch.") at 6 (proposing a search for, among other things, "No Labels /10 problematic" and "No Labels /10 trump"). No Labels also suggested that the deliberate reach of the Mehlhorn Subpoena beyond the outer boundaries of the actual claims and allegations the Delaware Action was justified by No Labels' hypothesis that other expressive and associational communications "*would* be relevant *to the extent* that the[] [requests] demonstrate contributory infringement." M&C Exch. at 5. No Labels also made a vague and unsubstantiated reference to "evidence produced to date," which purportedly "suggests that certain non-parties" were "aware of" or "supported" the "Defendant's attempts to tarnish No Labels' brand." *Id.*

Mehlhorn made clear that he categorically rejects any allegation, however veiled and circuitous, of contributory infringement. *Id.* Mehlhorn also reiterated his willingness to conduct searches for any documents that relate to the trademark and cybersquatting claims in the Delaware Action, but explained that No Labels' proposal was more likely to touch on First Amendment protected political activity than to yield any results relevant to the Delaware Action. Mehlhorn

asked clarifying questions about which custodians and platforms No Labels intended for Mehlhorn to search.  In response, No Labels withdrew from any negotiation efforts, declared an "impasse," and announced its intention to seek court intervention.  M&C Exch. at 9-10.

In view of the foregoing, Mehlhorn has no choice but to seek the protection of this Court to maintain his First Amendment privilege and to minimize the burden, expense, and harassment that will continue to flow from No Labels' attempts to root around in the communications of its political foes and to exact political revenge for Mehlhorn's political views and expression.

## ARGUMENT

### I.     The Mehlhorn Subpoena Requires Production of Privileged Matter

Where a third-party subpoena "requires disclosure of privileged or other protected matter," the court for "the district where compliance is required must quash or modify [the] subpoena." Fed. R. Civ. P. 45(d)(3)(A).[6]  And courts have long recognized a First Amendment privilege against disclosure of political affiliations and activities when such disclosure threatens to chill speech or otherwise impose a substantial burden on First Amendment rights. *See AFL-CIO v. Fed. Election Comm'n*, 333 F.3d 168, 175–76 (D.C. Cir. 2003) ("The Supreme Court has long recognized that compelled disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation.").

Here, in the midst of an active presidential election cycle, No Labels seeks to use non-party discovery to do precisely what the First Amendment forbids: reveal its political opponents'

---

[6] FRCP 45 designates "the court for the district where compliance is required" as the court with primary authority over all subpoena-related motions.  Fed. R. Civ. P. 45(d)(2)(B), (d)(3)(A); *see FDIC v. Galan-Alvarez*, No. 15-MC-0752 (CRC), 2015 WL 5602342, at *3 (D.D.C. Sep. 4, 2015) ("There is a presumption that subpoena-related disputes be litigated in the district designated for compliance.").  Because compliance with the Mehlhorn Subpoena is required in Washington D.C., this Court is the proper venue for the instant motion.  Mehlhorn Decl. ¶ 11.

"activities, strategies and tactics" and interfere with IIU's "internal operations." *AFL-CIO*, 333 F.3d at 177. Subpoenas that seek to uncover materials relating to "the very heart of the organism which the [F]irst [A]mendment was intended to nurture and protect: political expression and association concerning federal elections and officeholding" present the "most important reason for heightened judicial concern." *Fed. Election Comm'n v. Machinists Non-Partisan Pol. League*, 655 F.2d 380, 388 (D.C. Cir. 1981). This is precisely such a subpoena, and No Labels' transparent efforts to use non-party discovery to thwart Mehlhorn's and IIU's political activity must be quashed.

Courts deploy a burden-shifting framework to carefully balance a subpoena recipient's First Amendment privilege claim against the alleged interest of the party seeking the disclosure. *See In re Subpoenas Served on Am. Acad. of Pediatrics* ("*Pediatrics*"), No. 23-MC-0004 (CJN), 2023 WL 2351729, at *1 (D.D.C. Mar. 3, 2023). At the outset, the party asserting the First Amendment privilege must demonstrate that it has a First Amendment interest at stake. The litigant seeking protection "need not prove to a certainty that its First Amendment rights will be chilled by disclosure . . . only . . . that there is some probability that disclosure will lead to reprisal or harassment." *Black Panther Party v. Smith*, 661 F.2d 1243, 1267-68 (D.C. Cir. 1981), *cert. granted and vacated on other grounds*, 458 U.S. 1118 (1982).

Once that threshold has been cleared, the burden shifts to the party seeking disclosure to make a two-fold showing. *In re Kincaid*, No. 22-MC-0067, 2023 WL 5933341, at *5 (D.D.C. Aug. 9, 2023), *report & recommendation adopted*, 2023 WL 6459801 (D.D.C. Oct. 4, 2023). *First*, the party seeking disclosure must show that "the requested information goes to 'the heart of the lawsuit'" and is "crucial to the party's case." *Id.* at *5, *7 (internal citations omitted); *see also Wyoming v. U.S. Dep't of Agric.*, 208 F.R.D. 449, 455 (D.D.C. 2002). In so doing, the party

seeking disclosure must "describe the information they hope to obtain and its importance to their case with a reasonable degree of specificity." *Black Panther Party*, 661 F.2d at 1268; *see also U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Cos.*, 507 F. Supp. 2d 45, 51 (D.D.C. 2007). *Second*, the party seeking disclosure must show that it has "sought the [requested] information through alternative sources or otherwise made reasonable attempts to obtain the information elsewhere." *Pediatrics*, 2023 WL 2351729, at *1 (citing *Wyoming*, 208 F.R.D. at 455).

"[A]s the danger to rights of expression and association increases," so too does the "argument in favor of upholding the claim of [First Amendment] privilege." *Black Panther Party*, 661 F.2d at 1267. The D.C. Circuit has repeatedly underscored "the preferred position of First Amendment rights," emphasizing that "'[i]nfringement of First Amendment interests must be kept to a minimum.'" *Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 4 (D.D.C. 2002) (quoting *Black Panther Party*, 661 F.3d at 1268).

Here, this burden-shifting analysis leads straightforwardly to the conclusion that the Mehlhorn Subpoena must be quashed.

### A. Mehlhorn Has Well-Recognized First Amendment Interests at Stake

No Labels' expansive document requests do not present novel First Amendment issues. Courts within this District and Circuit have held that near-identical information in similar contexts should be protected from compelled disclosure under the First Amendment.

Document Requests Nos. Two, Three, and Six seek communications between Mehlhorn and his political partners and allies concerning a broad range of political organizing efforts untethered to the website at issue in the Delaware Action. Mehlhorn Subpoena at 9. On their face, these requests would call for communications where Mehlhorn and others brainstorm and discuss

ways to out-argue their political adversaries in the town square, or how to woo potential voters for which both No Labels and IIU-supported organizations have historically competed, or how and where to try to build more support for an alternative presidential candidate opposed by No Labels. Indeed, as written, the Mehlhorn Subpoena would compel him to turn over any communication in which he and others express any political disagreement with No Labels.

The D.C. Circuit has long recognized that compelled disclosure of both "internal communications" and "communications among various groups whose alleged purpose [is] to defeat" a political opponent "carr[y] . . . a real potential for chilling the free exercise of political speech and association guarded by the [F]irst [A]mendment." *Fed. Election Comm'n*, 655 F.2d at 388. Courts within this District have declined to enforce subpoenas that "seek internal communications and strategic communications on policy issues with other . . . advocacy groups." *Wyoming*, 208 F.R.D. at 454. These "First Amendment interests are implicated when releasing internal *and external* communications [and] could result in 'chilling the free exercise of political speech and association guarded by the First Amendment.'" *In re Kincaid*, 2023 WL 5933341, at *6 (emphasis added) (quoting *Fed. Election Comm'n*, 655 F.2d at 388.

Further, any production of communications and documents responsive to these Requests would necessarily disclose the identity of organizations and individuals involved in efforts to contest No Labels' political aims as well as, among other things, the political strategies deployed by these partners. While it is no secret that No Labels seeks political outcomes that are antithetical to Mehlhorn's stated political aims, Mehlhorn and IIU support and communicate with many political groups and organizers that do not have the same public profile. Mehlhorn Decl. ¶ 21. These partners rely on support from advocates like Mehlhorn to develop and promote their own political beliefs. Mehlhorn Decl. ¶ 20. These individuals and organizations also have First

Amendment interests at stake here and, in recognizing "'the vital relationship between freedom to associate and privacy in one's associations,'" the D.C. Circuit has held that subpoena recipients "may assert the right of . . . members and contributors to withhold their connection with [the subpoena recipient]." *Int'l Union, United Auto. Workers v. Nat'l Right to Work Found.* ("*Nat'l Right to Work*"), 590 F.2d 1139, 1152 (D.C. Cir. 1978) (quoting *NAACP v. Alabama*, 357 U.S. 449, 462 (1958)).

Document Request No. Four seeks all information "concerning the payment of money," presumably including IIU's efforts to fund any opposing political efforts, that reference or relate to No Labels. Mehlhorn Subpoena at 9. Compelled disclosure of all information "concerning the payment of money . . . related to No Labels" likewise threatens to identify individuals and groups involved in legitimate efforts to push back on No Labels' political aims through political fundraising and donations. Mehlhorn Decl. ¶¶ 21-27. Compelled disclosure of information related to political financing would likely also reveal future plans for political organizing, in the run up to an important presidential election. Mehlhorn Decl. ¶¶ 17-18, 27-28. And Request Four appears to call for information that would reveal which organizations and individuals rely on support from Mehlhorn and IIU to express their political views, which could chill fundraising efforts in the future. *Id.* All of this goes to the heart of Mehlhorn and IIU's First Amendment rights: In *Buckley v. Valeo*, the Supreme Court reiterated that the First Amendment "right to join together 'for the advancement of beliefs and ideas,' is diluted if it does not include the right to pool money" and "the invasion of privacy of belief may be . . . great when the information sought concerns the giving and spending of money." 424 U.S. 1, 65-66 (1976). And Courts in this District have similarly recognized that "the freedom to organize, raise money, and associate with other like-

minded persons" is threatened by compelled disclosure of political donations and finances. *Wyoming*, 208 F.R.D. at 454 (quoting *Int'l Action Ctr.*, 207 F.R.D. at 3).

Document Request No. Six seeks "attendance lists; invitation lists; presentations . . . transcriptions; and recordings of [any] meetings" relating to No Labels, which could conceivably encompass any organizing meetings where No Labels is even referenced. Membership lists of political organizations have long been protected from compelled disclosure. "[A] sweeping demand . . . for membership lists. . . cannot . . . be approved by [a] court without ignoring vitally important constitutional freedoms by which Americans conduct their political affairs." *Fed. Election Comm'n*, 655 F.2d at 397. Indeed, the notion that it would significantly chill political speech for a political adversary to obtain access to recordings, transcripts, attendance, and even invitation lists of meetings where any and all manner of political ideas and plans are discussed cannot be easily dismissed as speculative. Mehlhorn Decl. ¶¶ 22-26.

Finally, Document Request No. Seven requests "[a]ll Google Docs, Google Sheets, and/or Google Slides . . . concerning No Labels . . . and/or nolabels.org," without any limitation on the topic or type of information reflected on those platforms. Google Docs, Sheets, and Slides are simply platforms for recording and sharing ideas and information in written form, and responsive materials could reflect a wide range of political organizing activity. Further, political organizations have a First Amendment interest in materials relating to how technological platforms are used to conduct political advocacy, including with respect to engaging donors and volunteers, which would be threatened here by compelled disclosure. *See RNC v. Pelosi*, 602 F. Supp. 3d 1, 33 (D.D.C. 2022), *vacated as moot*, No. 22-5123, 2022 WL 4349778 (D.C. Cir. Sept. 16, 2022).

## B. The Mehlhorn Subpoena Seeks Documents that Are Not Relevant—Much Less Crucial—to the Delaware Action

No Labels cannot overcome the deep invasion of Mehlhorn's First Amendment rights that the Mehlhorn Subpoena would mount. Certainly, No Labels cannot show that the troves of material they seek go "to the heart of the [Delaware Action]," or are "crucial" to No Labels' case. *Wyoming*, 208 F.R.D. at 453, 455. To the contrary, the Mehlhorn Subpoena requests documents that are facially irrelevant to No Labels' allegations of trademark infringement or cybersquatting in the Delaware Action and seeks information that could only be relevant to No Labels' efforts to uncover and thwart the work of its perceived political opponents. Particularly when viewed against the backdrop of No Labels' DOJ Letter, which spun conspiracy theories about political advocates who disagree with No Labels and urged law enforcement to take action against No Labels' perceived political opponents, the potential chilling effect of this fishing expedition is all the more grave. Mehlhorn Decl. ¶¶ 26, 28-30.

Document Request No. Two is perhaps the most unabashed of No Labels' attempts to use non-party discovery to improperly collect information on its political rivals. In that request, No Labels demands that Mehlhorn produce "[a]ll documents and communications . . . concerning No Labels and/or nolabels.org," without subject-matter limitation or time restraint. Mehlhorn Subpoena at 9. In effect, No Labels would compel Mehlhorn to divulge all documents and communications related to any political organizing or advocacy efforts aimed at combatting the influence and impact of a political organization that Mehlhorn opposes. Indeed, this request is so broad on its face as to encompass any communication where Mehlhorn even expresses political disagreement with No Labels. And, as No Labels obviously intends, the production of responsive communications would reveal the identities of the persons and organizations involved in an effort

to contest No Labels' political aims. Without any limiting reference to the issues in the Delaware Action, the Defendant, or the Domain, this request is plainly irrelevant to the Delaware Action.

No Labels' other document requests present the same glaring issues regarding relevance. Document Request No. Four demands that Mehlhorn produce "[a]ll documents and communications . . . concerning the payment of money, expenditures, salaries, consulting fees, retainers, bonuses, or any form of renumeration related to No Labels . . . and/or nolabels.org." Mehlhorn Subpoena at 9. On its face, this request would encompass a political donation or fundraising effort to entice voters previously drawn to the No Labels campaign, which, of course, has nothing to do with the trademark infringement or cybersquatting alleged in the Delaware Action. Mehlhorn Decl. ¶¶ 13 17. Document Request No. Six demands production of "all documents and communications . . . related to any in-person or virtual meetings concerning No Labels . . . and/or nolabels.org, including, but not limited to attendance lists, invitation lists; presentations" and more. Mehlhorn Subpoena at 9. It cannot be the case that the mere invitation of a potential political partner to an organizing event or meeting focused on pushing back against No Labels' preferred presidential candidate, but which has nothing to do with the Domain, the Defendant in the Delaware Action, or the allegedly infringing conduct, goes to the heart of the Delaware Action. Nevertheless, any such invitation would be responsive to the Mehlhorn Subpoena considering the breadth of this request. Mehlhorn Decl. ¶¶ 13-17.

To be clear, Mehlhorn has attempted to resolve these substantial overbreadth issues by limiting a search for responsive materials to documents that reference or relate to the Defendant in the Delaware Action, the Domain at issue, or the allegedly infringing conduct. No Labels rejected this offer, cut off any further negotiation or discussion, and stated its belief that it is entitled to use the Mehlhorn Subpoena to gather evidence in support of its suspicion that No Labels' political

opponents worked together to "damage" No Labels' reputation. That is simply not the law, and No Labels cannot satisfy its burden to show that the materials it seeks are "crucial" to its case.

## C. No Labels Can—And Must—Seek the Requested Information Elsewhere

No Labels also cannot satisfy its burden to show that it has "sought the [requested] information through alternative sources or otherwise made reasonable attempts to obtain the information elsewhere." *Pediatrics*, 2023 WL 2351729, at *1. Much of the discovery that No Labels seeks through the Mehlhorn Subpoena can, and therefore should, be obtained through party discovery. Indeed, No Labels initially requested much of this information directly from Defendants. But before the Special Master, No Labels later made a tactical choice to narrow the scope of party discovery and agreed to drop its requests for invasive discovery into protected material. No Labels does not get to take a mulligan now, particularly when it threatens the constitutional rights of *non*-parties.

Take Document Request No. Four for example. That request seeks documents and communications relating to the "payment of money, expenditures, salaries, consulting fees, etc. related to No Lables, NoLabels.com Inc., NoLabels.com, No Labels.com Domain, and/or nolabels.org." Mehlhorn Subpoena at 9. In the Delaware Action, No Labels similarly sought information regarding "payment," and "solicitation of funds," as well as "those who are funding Defendant and/or otherwise directing or supporting its infringing activity." Special Master Order, Dkt. No. 60-1 at 3. But after the Defendant raised First Amendment objections, No Labels narrowed its discovery demands and confirmed it was only seeking information concerning individuals or entities "who are either involved in the infringing conduct or who are undeniably relevant and important witnesses." Special Master Order, Dkt. No. 60 at 5. "No Labels [was ultimately] willing to limit its [discovery] motion [against Defendant] to documents and testimony concerning the identity of the individuals/entities who participated in the infringing conduct," *id.*,

16

Dkt. No. 60-1 at 3, thereby excluding from disclosure any "donor, volunteer, or member" information. *Id.,* Dkt. No. 60 at 9. Yet this is precisely the information that No Labels now seeks from non-parties it apparently suspects of being allies of the Defendant in the Delaware Action.

Absent any reason to believe that Mehlhorn has certain unique evidence, unavailable through party discovery, which actually bears on Defendant's allegedly infringing conduct or intent, No Labels cannot invade Mehlhorn's First Amendment interests or burden Mehlhorn with an attempted end-run around the discovery it was permitted to take in the Delaware Action. *See Diamond Servs. Mgmt. Co. v. Knobbe, Martens, Olson & Bear, LLP,* 339 F.R.D. 334, 340 (D.D.C. 2021) (granting motion to quash because, among other reasons, the party that served the subpoena would be able to obtain the requested information through party discovery, should its claims survive a motion to dismiss). Mehlhorn should not be required to bear the substantial burden of No Labels' scattershot tactics in the Delaware Action, particularly at the high price of his First Amendment rights.

## II.    The Subpoena Is Unduly Burdensome

Even putting the grave First Amendment issues to the side, the Mehlhorn Subpoena must be quashed. Indeed, where a third-party subpoena "subjects a person to undue burden[,]" the court for "the district where compliance is required must quash or modify [the] subpoena" upon timely motion by the affected party. Fed. R. Civ. P. 45(d)(3)(A)(iv).[7] That is plainly the case here.

To start, all civil discovery is limited in scope by FRCP 26, which dictates that discovery sought from parties and nonparties alike must be "relevant to [a] party's claim or defense," and

---

[7] The First Amendment issues are fatal on this prong of Rule 45 as well, because, "[i]f a subpoena compels disclosure of information that is not properly discoverable, then the burden it imposes, however slight, is necessarily undue." *Gouse v. Dist. of Columbia,* 359 F. Supp. 3d 51, 56 (D.D.C. 2019) (quoting *AF Holdings, LLC v. Does 1-1058,* 752 F.3d 990, 995 (D.C. Cir. 2014)).

"proportionate to the needs of the case." Fed. R. Civ. P. 26(b)(1). These requirements seek to ensure that the anticipated benefits of discovery to the requesting party are not outweighed by the burdens placed on the subpoena recipient. *See Eidos Display, LLC v. Chunghwa Picture Tubes, Ltd.*, 296 F.R.D. 3, 6 (D.D.C. 2013). The relevance requirement, although broadly construed, cannot be stretched so far as to encompass "information with no conceivable bearing on the case." *Burlington Ins. Co. v. Okie Dokie, Inc.*, 368 F. Supp. 2d 83, 86 (D.D.C. 2005) (internal citations and quotation marks omitted). And the proportionality requirement is assessed by "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

When it comes to non-parties, discovery must be "limited even more." *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019) (internal citations omitted). Accordingly, FRCP 45 requires that "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). And district courts "have discretion to limit discovery to prevent undue expense [and burden] to third parties, even if the discovery sought is within the permissible scope of Rule 45 and Rule 26." *Millennium TGA, Inc. v. Comcast Cable Commc'ns LLC*, 286 F.R.D. 8, 11 (D.D.C. 2012).

"When evaluating whether the burden of subpoena compliance is 'undue,' the court balances the burden imposed on the party subject to the subpoena by the discovery request, the relevance of the information sought to the claims or defenses at issue, the breadth of the discovery request, and the litigant's need for the information." *Call of the Wild Movie, LLC v. Does 1-1,062,*

770 F. Supp. 2d 332, 354 (D.D.C. 2011). Courts also consider "the time period covered by [the request] [and] the particularity with which the documents are described." *Flatow v. The Islamic Republic of Iran*, 196 F.R.D. 203, 206 (D.D.C. 2000), *aff'd in part, vacated in part on other grounds*, 305 F.3d 1249 (D.C. Cir. 2002). Party status is also a factor in "weighing the burden of imposing discovery," and are less willing to impose burdensome discovery on non-parties. *Wyoming*, 208 F.R.D. at 452.

Here too, this well-worn analysis requires the Mehlhorn Subpoena be quashed. Alternatively, where a subpoena recipient "has in good faith conferred or attempted to confer with other affected parties," but was unable to reach a resolution independent of court interference, "[a] court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). In determining whether good cause exists, courts consider the same standard for assessing an undue burden under FRCP 45(d)(3). *See Achte/Neunte Boll Kino Beteiligungs Gmbh & Co. v. Does 1-4,577*, 736 F. Supp. 2d 212, 214 (D.D.C. 2010) (internal citations and quotation marks omitted) ("To determine whether there is an 'undue burden,' a court examines relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.")

Whether by an order quashing the Mehlhorn Subpoena, or by a protective order, the Court must put an end to No Labels' tactics.[8]

---

[8] For the avoidance of doubt, a protective order pursuant to Rule 26(c)(1) is also appropriate on the basis of the First Amendment violations, for all the reasons explained in Section I, supra.

## A. The Requested Information Is Neither Relevant nor Sought on the Basis of Relevance

As described supra (pp. 14-15), the document requests in the Mehlhorn Subpoena are overbroad and are not limited to the issues, parties, or allegedly infringing conduct in the Delaware Action. In the course of Mehlhorn's efforts to confer with Plaintiff No Labels regarding the scope of the Mehlhorn Subpoena, No Labels expressly rejected Mehlhorn's proposal to limit its searches to documents concerning the issues in the Delaware Action and acknowledged that the Mehlhorn Subpoena was intentionally not limited in scope to the claims in the Delaware Action.

Perhaps coming to recognize that seeking discovery "outside the scope of the discovery needed for [No Labels] to prove its claim[s]" is impermissible, *Wyoming*, 208 F.R.D. at 454, No Labels offered up a new theory, suggesting that its overbroad requests are okay here because No Labels is considering pursuing a new theory of contributory infringement against new potential defendants. No Labels has not and cannot point to any basis in fact or law to support this allegation, which has been offered as no more than a hunch. In any event, it cannot provide a basis for No Labels' subpoena. Courts routinely reject "naked attempt[s] to [use third-party subpoenas as a tool to] gather information for use in evaluating, and perhaps litigating, a claim against [a non-party]." *Phillips & Cohen, LLP v. Thorpe*, 300 F.R.D. 16, 18 (D.D.C. 2013); *see also Black Panther Party*, 661 F.2d at 1268 ("Mere speculation that information might be useful will not suffice . . . ."); *AF Holdings*, 752 F.3d at 995 ("[W]hen the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery properly is denied."). FRCP 45 simply does not "allow a party to roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so." *US Dominion Inc. v. My Pillow Inc.*, No. 21-CV-0445, 2024 WL 2880425, at *3 (D.D.C. June 7, 2024) (noting the "crucial distinction" between "permitting discovery to flesh out a pattern of facts

already known and the illegitimacy of permitting discovery against a third party premised on an unfounded suspicion") (internal quotations omitted).

### B. The Requested Information Is Not Proportionate to the Needs of the Delaware Action

Even if the information sought were relevant, which it is not, the Court should grant Mehlhorn's requested relief because the information sought by No Labels is not proportionate to the needs of the Delaware Action. The claims in the Delaware Action are straightforward and the facts are largely undisputed. All parties agree, for example, that Defendant owned and operated the allegedly infringing website, and there is no dispute concerning the contents of the website. No Labels has not, and cannot, explain why the material it seeks from Mehlhorn is necessary for it to pursue its claims. This is underscored by the fact that No Labels made a tactical choice to abandon its pursuit of much of the information it now seeks through party discovery. (*See supra* 16-17.) "This simply is not a case in which the [party seeking information] had 'no reasonable basis to know where to begin' to find the information they sought . . . ." *Nat'l Right to Work*, 590 F.2d at 1153 (quoting *Carey v. Hume*, 492 F.2d 631, 639 (D.C. Cir. 1974)). To the contrary, No Labels is immersed in a dynamic party discovery process overseen by a Special Master; if No Labels actually needed the information it seeks here, it would "attempt to seek [that] information from other likely and reasonably accessible sources," as it is required to do. *Id.* at 1153.

### C. The Mehlhorn Subpoena Poses a Substantial Burden

Finally, the Mehlhorn Subpoena threatens to impose a substantial burden on Mehlhorn beyond its significant infringement on Mehlhorn's First Amendment rights. Attempted compliance with requests as broad and far reaching as those within the Mehlhorn Subpoena will force Mehlhorn to expend substantial financial and other resources. As discussed above, Mehlhorn attempted, in good faith, to reach a compromise without resort to litigation. (Pp. 6-8). Specifically,

Mehlhorn proposed that Plaintiff No Labels' requests be limited to the actual issues in the Delaware Action, including the Domain, the Defendant, and the allegedly infringing conduct. However, Mehlhorn's efforts were rebuffed when No Labels declared an "impasse" after a single exchange, and Mehlhorn was left with no option other than to seek the protection of this Court.

Mehlhorn took these steps to negotiate a compromise with No Labels in large part because of Mehlhorn's desire to avoid the cost, time, and resources required to litigate a dispute regarding the Mehlhorn Subpoena. Still, the cost of litigating the instant dispute is dwarfed by the prospective cost associated with a non-party subpoena so facially overbroad. The cost of collecting and reviewing documents to ensure compliance with the Mehlhorn Subpoena is daunting, and would require extensive expenditures on document reviewers, attorneys, and e-discovery vendors, even if few documents ended up being responsive. Mehlhorn Decl. ¶¶ 31-35. "The 'undue burden' test requires district courts to be 'generally sensitive' to the costs imposed on third parties by subpoenas . . . ." *In re Micron Tech., Inc. Sec. Litig.*, 264 F.R.D. 7, 9 (D.D.C. 2010) (quoting *Watts v. S.E.C.*, 482 F.3d 507, 509 (D.C. Cir. 2007)).

These substantial costs—as well as the serious First Amendment concerns raised by the breadth and sensitive political subject matter of the document requests—all require that the Mehlhorn Subpoena be quashed, particularly when balanced against the total absence of a cognizable connection between the information demanded by No Labels and its claims in the Delaware Action. No Labels has made clear that it is using non-party discovery to further its flailing efforts to exact retribution on the political adversaries who beat back No Labels' spoiler efforts. This abuse of the discovery process must be put to a swift and decisive end.

## CONCLUSION

For the reasons set forth herein, Mehlhorn respectfully requests that the Court quash the Mehlhorn Subpoena pursuant to FRCP 45 or, in the alternative, grant its motion for a protective order under FRCP 26.

## RULE 7(m) STATEMENT

As set forth herein, counsel for Mehlhorn has engaged in discussions with counsel for No Labels in an attempt to resolve this matter without the necessity of this motion but the parties have been unable to reach agreement.

August 14, 2024
New York, New York

John C. Quinn*
Joshua A. Matz
Hyatt Mustefa*
Jackson Erpenbach*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York
Telephone: (212) 763-0883
jquinn@heckerfink.com
jmatz@heckerfink.com
hmustefa@heckerfink.com
jerpenbach@heckerfink.com
* pro hac vice pending

*Attorneys for Dmitri Mehlhorn*